UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JOSEPH BARRESE, | Case No. 2:18-cv-1671-KJD-DJY |
| Plaintiff, | **ORDER** |
| v. | |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT, *et al.*, | |
| Defendants. | |

In the middle of the night on September 4, 2016, plaintiff, Joseph Barrese, was attacked and strangled by a fellow inmate at the Clark County Detention Center. At the time, Barrese was serving a 120-day sentence after pleading guilty to stealing a scooter. Though the attack did not kill Barrese, it left him with physical and emotional injuries. Barrese filed this suit against the Las Vegas Metropolitan Police Department ("Metro"), Deputy Chief Richard Suey, and Corrections Officer Kevin Gale to recover damages related to the attack. Barrese's claims against Metro and the individual officers break down into two groups: federal claims under 28 U.S.C. § 1983 and state law negligence claims. The three defendants now move for summary judgment on each of Barrese's claims (ECF No. 17). Barrese has responded in partial opposition (ECF No. 20), and the three defendants replied (ECF No. 22).

**I.    Background**

On July 28, 2016, Joseph Barrese pleaded guilty to one count of attempted grand larceny auto after trying to steal a motorized scooter. See Plea Agreement and Information, ECF No. 21-5. Barrese received a 120-day sentence with credit for 21 days already served. P.'s Resp. 4, ECF No. 20. Barrese was assigned to the Clark County Detention Center to serve his sentence. During that time, Barrese was housed in CCDC's South Tower, Module 3P, a dormitory-style housing

unit. Id. Unlike other housing units in CCDC, there were no cells in Barrese's module, and the inmates were afforded more liberty to move around the facility.

Non-party Franklin Sharp also lived in Barrese's module. Sharp was awaiting trial on charges of robbery with a deadly weapon. Allegedly, Sharp approached his victim near a bus stop, brandished a fixed-blade knife, and forced the victim to "beg for [his] life" while stealing the victim's phone. Police Report 2–3, ECF No. 21-6 (internal quotations omitted). Sharp's robbery charge was the latest in his long and diverse criminal history. To that point, Sharp had been convicted of ten felonies and twenty-seven misdemeanors. Sharp Pre-Trial Information Sheet, ECF No. 21-7.

Despite the differing severity of Barrese and Sharp's charges (scooter theft versus armed robbery) and the variance in their criminal histories, the two were housed in the same dormitory-style module. Just after 1:00 a.m. on September 4, 2016, Sharp left his bed, unraveled a piece of his bedsheet, approached a sleeping Barrese, and used the bedsheet to strangle Barrese. Arrest Report 2, ECF No. 21-3. While strangling Barrese, Sharp uttered "die motherfucker" repeatedly until Corrections Officer Kevin Gale stopped the assault. Id. The attack left Barrese with physical and psychological injuries, post-traumatic stress disorder, and insomnia. See P. Med. Records, ECF No. 21-8.

Barrese brought this case in September of 2018 to recover damages related to Sharp's attack. Barrese chose not to sue Sharp for the attack. Instead, he brought federal and state claims against the Las Vegas Metropolitan Police Department, who operates the Clark County Detention Center, Corrections Officer Kevin Gale, who intervened in Sharp's attack, and Deputy Chief Richard Suey, who oversees the Detention Services Division of the detention center. The three defendants now move for summary judgment on each of Barrese's claims.

## II. Legal Standard

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). It is available only where the absence of material fact allows the Court to rule as a matter of law. Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 322. Rule 56 outlines a burden shifting approach to summary

1  judgment. First, the moving party must demonstrate the absence of a genuine issue of material
2  fact. The burden then shifts to the nonmoving party to produce specific evidence of a genuine
3  factual dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
4  (1986). A genuine issue of fact exists where the evidence could allow "a reasonable jury [to]
5  return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
6  (1986). The Court views the evidence and draws all available inferences in the light most
7  favorable to the nonmoving party. Kaiser Cement Corp. v. Fischbach & Moore, Inc., 793 F.2d
8  1100, 1103 (9th Cir. 1986). Yet, to survive summary judgment, the nonmoving party must show
9  more than "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

### III.   Discussion

Barrese's claims break down into two groups: six civil rights claims under 42 U.S.C. § 1983 and one state-based negligence claim. Barrese's federal claims are: (1) an Eighth Amendment failure-to-protect claim against each defendant, arising out of Sharp's attack; (2) a Fourth Amendment over-detention claim against each defendant; (3) a Fourth Amendment false imprisonment claim; (4) a municipal liability claim under Monell v. Dept. of Soc. Sec. Svcs., 436 U.S. 658 (1978); (5) a failure-to-train claim against each defendant under § 1983; and (6) a claim for mental or emotional suffering against each defendant under § 1983. Barrese's lone state claim is for negligence against each defendant. The parties agree that Barrese's sixth claim for mental or emotional suffering is not a cognizable claim under § 1983. See P.'s Resp. 13 n.8, ECF No. 20. Accordingly, the Court grants summary judgment on that claim. The Court will evaluate each of Barrese's other claims below.

**A.  Barrese's Federal Claims under 42 U.S.C. § 1983**

Title 42 U.S.C. § 1983 allows plaintiffs to bring civil rights claims against any individual or agency who deprives them of their civil rights. Section 1983 does not create rights on its own. It is merely a vehicle for a plaintiff to vindicate rights conferred elsewhere. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). Because the statute itself does not confer additional rights, the plaintiff must first identify the source of the allegedly infringed civil right. Once it does, the plaintiff must demonstrate (1) that the infringing person or agency acted under the color of state

1 law and (2) that their conduct deprived the plaintiff of some right guaranteed by the Constitution
2 or laws of the United States. It is undisputed that Metro and Officers Gale and Suey acted under
3 color of state law. The parties dispute whether any of the three defendants deprived Barrese of
4 his civil rights. The Court turns first to Barrese's Eighth Amendment claim.

*1. Failure to Protect under the Eighth Amendment*

Barrese first seeks relief under the Eighth Amendment. His argument is threefold. First, Barrese argues that Officer Gale was deliberately indifferent to his safety because the officer failed to prevent Sharp's attack on Barrese. Second, Barrese argues that Metro and Officer Gale failed to protect him from Sharp by allowing Sharp to share Barrese's dormitory-style housing module despite Sharp's long—and violent—criminal history. Third, Barrese argues that Metro failed to adequately train corrections officers to accurately classify the risk an inmate poses others, or alternatively, that failed to train officers to prevent inmate-on-inmate attacks.

The touchstone of the Eighth Amendment is its prohibition on cruel and unusual punishment. U.S. Const. amend VIII. The prohibition on cruel and unusual punishment extends to more than just punishment at the hands of the state. It covers several aspects of a detained individual's life, including the overall conditions of a detainee's confinement (see Wilson v. Seiter, 501 U.S. 294 (1991)), the individual's safety from prison officials (see Hudson v. Palmer, 468 U.S. 517 (1984)) and other inmates (see Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986), and even the quality of medical attention afforded detainees (see Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

Not every failure by municipal agency or government employee violates the Eighth Amendment. Likewise, not every inmate injury is the result of an Eighth Amendment violation. A defendant violates the Eighth Amendment if he is deliberately indifferent to the inmate's safety. Farmer v. Brennan, 511 U.S. 825, 836 (1994). The term "deliberate indifference" is not a self-defining mental state and merely represents the place on a continuum where a government official's constitutional deprivation becomes actionable under the Eighth Amendment. On one end of the continuum is an official's unsanctioned and intentional infliction of physical harm, which certainly violates the Eighth Amendment. On the other end is mere negligence or

1   carelessness, which does not violate the Eighth Amendment. See Estelle, 429 U.S. at 105–06.
2   Somewhere between those two poles lies deliberate indifference. Farmer, 511 U.S. at 836. Courts
3   have often equated deliberate indifference with recklessness. Id. ("it is fair to say that acting or
4   failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the
5   equivalent of recklessly disregarding that risk."); Starr v. Baca, 652 F.3d 1202, 1205 (9th Cir.
6   2011) (deliberate indifference to a prisoner's safety "tantamount" to a reckless desire to inflict
7   harm).

8   So, what mental state constitutes deliberate indifference in a civil rights case? In short,
9   the official must "know of *and* disregard an excessive risk to inmate . . . safety." Farmer, 511
10  U.S. at 837 (emphasis added). To do so, the official must have enough facts to understand the
11  risk to the inmate's safety, and he must make that inference. Id. This partly objective, partly
12  subjective test ensures that a prison official will not be liable unless he deliberately fails to
13  protect an inmate despite having enough facts to understand the inmate's risk of harm.

14  Barrese has not provided evidence that Officer Gale was aware of his risk of harm, nor
15  has he shown that the officer was indifferent to that risk. Even interpreting the parties' evidence
16  in Barrese's favor, he has not shown that Officer Gale's conduct knowingly violated Barrese's
17  rights. The gist of Barrese's argument is that Officer Gale knew that Barrese risked being
18  attacked by Sharp given Sharp's extensive criminal history and the open, dorm-style setup of the
19  inmates' living module. Alternatively, Barrese claims that his risk of harm was obvious due to
20  the fact that Metro hires corrections officers in the first place. The evidence does not support
21  either argument.

22  First, there is no evidence that Officer Gale intentionally disregarded the safety of the
23  inmates in Barrese's module. Barrese provides Officer Gale's report that the officer prepared
24  after the Sharp attack. There, Officer Gale admits that he was not aware that Barrese was in
25  danger until after Sharp had already begun strangling him. After viewing the security video, the
26  officer acknowledges that Sharp sat up in his bed, put on his recreational shoes, which was
27  against the rules, unraveled a strap of bed sheet, left his bed, and walked to Barrese's bed where
28  he began strangling Barrese all before the officer realized what was happening. Arrest Report 2,

ECF No. 20-3. However, as soon as Officer Gale realized that Barrese was in danger, he notified dispatch of the attack and entered the module to stop the assault. Id. The problem for Barrese is that even if Officer Gale failed to prevent Sharp's attack on Barrese, there is no evidence that he knowingly disregarded Barrese's risk of harm. As a result, the officer's failure to prevent the attack was careless at worst. Moreover, if conduct like Officer Gales' was actionable under § 1983 after every inmate-on-inmate attack, courts would be inundated with such claims. Imposing liability in such cases would grossly overread the deliberate indifference standard. Where, as here, a corrections officer fails to prevent an inmate-on-inmate attack but immediately intervenes to stop the attack, the officer is not liable under § 1983.

Second, there is no evidence that Officer Gale was aware of Sharp's violent record or that Metro failed to train him in classifying violent inmates. We now know that Sharp's criminal record was lengthy and violent. He was arrested after allegedly robbing a victim at knifepoint while forcing the victim beg for his life. Sharp Arrest Rep. 2, ECF No. 20-6. There is no evidence, however, that Officer Gale knew Sharp's history at the time of the attack on Barrese.[1] If the officer did not know of Sharp's history or how that history could create a risk of harm for Barrese, he could not make the inference that Barrese suffered a substantial risk of harm. Accordingly, a reasonable juror could not conclude that Officer Gale was deliberately indifferent to Barrese's risk of harm.

Barrese also claims that Metro failed to protect him because it knew of Sharp's violent tendencies but still housed him in a dorm-style module with Barrese, a non-violent detainee. Though it appears that Metro was aware of Sharp's violent criminal history, there is no evidence that Metro has created policies or customs that caused Barrese's injury. As a result, Metro is entitled to summary judgment.

---

[1] Barrese relies heavily on Sharp's behavior after the attack to bolster his claim that corrections officers and Metro were aware of the risk Sharp posed to other inmates. After attacking Barrese, Sharp was charged with attempted murder and moved to a more traditional holding cell. Sadly, Sharp would later kill his cellmate, Jeremiah Bowling. Sharp has since been charged with murder in the Nevada district court. See P.'s Resp. 11, ECF No. 20. Sharp's actions are reprehensible, but his future crimes could not make Barrese's risk of harm any more apparent to Officer Gale or to Metro.

As a municipal entity, Metro can only be liable under § 1983 under certain circumstances. First, if the agency's policies or customs deprive a person of his constitutional rights, the plaintiff may prevail. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Alternatively, the plaintiff may prevail if the agency's failure to train its employees results in deliberate indifference to a person's constitutional rights. City of Canton v. Harris, 489 U.S. 378, 390 (1989).[2] Barrese has not shown such a policy or failure to train here.

Barrese claims that Metro's history of failure to protect inmates is "epic," yet points to no current policy or custom that caused such an "epic" failure. In support Barrese first cites to a 1998 DOJ report that evaluated CCDC's detention policies. DOJ Rep., ECF No. 20-9. The DOJ Report found several deficiencies with the detention centers policies and procedures after inspecting the facility. Those deficiencies included overcrowding in holding areas (id. at 3), generally unsanitary conditions (id.), inadequate suicide screening and prevention (id. at 4–5), and untimely or inadequate medical care (id. at 6). The report also recommended several remedial measures to ensure that inmate detention was constitutionally adequate. Id. at 6–7.

Though the DOJ Report highlights glaring deficiencies in CCDC's procedures from 1997, it does not evince a current pattern or practice that could have caused Barrese's injury. In fact, the report's only deficiency related to the housing of inmates concerned the lower-floor holding cells, not the open-style module that Barrese and Sharp occupied. See id. at 3 (finding fault with mass holding cells that were "extremely overcrowded and unsanitary"). The issue with those holding cells was not that dangerous or predatory inmates were indifferently housed with at-risk inmates. The issue was that there was not enough space in the holding cells to adequately monitor inmate behavior and safety. Id. Additionally, the DOJ Report is more than twenty years old, and it is unclear whether—or to what extent—Metro implemented the DOJ's suggested remedies. Setting aside the age of the report, it does not provide evidence of a policy or custom that Metro routinely houses dangerous inmates with vulnerable ones.

---

[2] The Court recognizes that a municipal agency could also be liable if the individual committing the constitutional tort had "final policy-making authority" or if the policy-making official ratifies such an action. See Clouthier v. Cnty. of Contra Costa, 591 F.3d 1232, 1250 (9th Cir. 2010). However, there is no evidence here that either individual defendant had policy-making authority or that a policy-making authority ratified their conduct.

- 7 -

Barrese also provides a 2016 CCDC audit report that similarly fails to evince a policy or procedure that violated his constitutional rights. The Commission on Accreditation for Corrections Standard tracked several CCDC statistics over a twelve-month period and published its findings. Of concern here, according to Barrese, is that the Commission's investigation revealed 602 inmate-on-inmate physical assaults in the preceding twelve months. CCDC Audit Rep. 49, ECF No. 17-C. As Barrese points out, that is more than fifty assaults each month. P.'s Resp. at 12. Certainly, fifty inmate-on-inmate assaults per month is concerning. However, context is helpful. CCDC houses minimum-security, medium-security, and maximum-security detainees. Id. at 28. The maximum capacity of the facility is 2,982 inmates, and the average daily population during the reporting period was 2,660. Id. During that time period, three inmates died while detained. Id. at 50 (two died of natural causes, and one more reported death was under investigation). Given that corrections officers supervise nearly 3,000 inmates on a daily basis with some requiring maximum security, 602 inmate-on-inmate assaults over a one-year period is not outrageous. But more to the point, the data point of 602 inmate-on-inmate assaults in twelve months, on its own, does not show a policy or custom of indifference to the safely of inmates.

At bottom, Barrese has not presented evidence that would lead a reasonable jury to conclude that Metro and CCDC operated under a policy or custom that created indifference to Barrese's health and safety, nor has Barrese shown that Metro failed to train corrections officers to adequately classify each inmate's level of risk. Accordingly, Metro cannot be liable under Monell, and the Court grants summary judgment in favor of defendants on Barrese's Eighth Amendment, Monell, and failure-to-train claims.[3]

### 2. *Over-Detention and False Imprisonment under the Fourth Amendment*

Next, Officer Gale and Metro move for summary judgment on Barrese's Fourth Amendment claim. The essence of Barrese's Fourth Amendment claim is that CCDC detained him longer than his sentence allowed. Because the state's authority to detain him expired before he was released, Barrese argues, every extra second he remained in CCDC's custody violated his

---

[3] Because the Court finds no Eighth Amendment violation by individual officers or by Metro, the municipal entity, the Court need not reach whether qualified immunity shields these defendants from civil liability.

Fourth Amendment right to be free from detention and constituted false imprisonment. Barrese breaks the claim into two parts: over-detention in violation of the Fourth Amendment and false imprisonment in violation of the Fourth Amendment.

Barrese pleaded guilty shortly after his arrest and received a sentence of 120 days minus the 21 days he already served. J. of Conviction, ECF No. 17-4. He was arrested on July 8 and was released around November 5.[4] The parties disagree whether Barrese's sentence was 120 days of "flat time," or whether Barrese could qualify for early release by earning good-time credits and work-related credits. P.'s Resp. at 13. The type of Barrese's sentence matters because a "flat-time" sentence would constitute 120 days no matter how well Barrese behaved or how many hours he worked during his detention. If the sentence were not a "flat-time" sentence, however, Barrese could have been eligible for early release. Barrese believed that his good behavior and work credits were set to reduce his overall sentence under N.R.S. § 211.320(2), which allows the Sheriff to reduce a sentence up to five days per month detained if the detainee was "obedient, orderly, and faithful." Because Barrese served three entire calendar months, he argues he was eligible for fifteen days of sentence reduction in addition to any work-credit reduction he earned. According to Barrese, that was thirty-four days total. Yet, CCDC did not grant Barrese credit for good-time or credit for hours worked, and he served at least 120 days.

Barrese argues that the reason CCDC withheld his good-time and work-related credit is punishment because of his altercation with Sharp—an altercation in which Barrese was savagely attacked in his sleep. Metro counters that summary judgment is appropriate on this claim because Barrese has not presented more than hearsay, conclusory statements to support his claim to good-time or work-related credit. But Barrese has submitted more than just self-serving testimony. He also presents his plea agreement and judgment of conviction, which do not classify his sentence as a "flat-time" sentence. See ECF No. 17-D. If, as Barrese argues, he was able to reduce his sentence through good-time and work credit, it is plausible that CCDC withheld his good-time and over-detained him. Barrese can testify at trial that he indeed worked and that he believed that work and good behavior would shave time off of his sentence. Whether CCDC withheld that

---

[4] The exact date of Barrese's release is unclear. See P.'s Resp. at 15 n.10.

time due to Sharp's attack on Barrese is a genuine issue of fact that prevents summary judgment. Accordingly, the Court denies summary judgment on Barrese's over-detention and false imprisonment claims.

### B. Barrese's State-Law Negligence Claim

Barrese's final claim is for state-law negligence. He argues that Officer Gale and Metro had a duty to protect him from Sharp and that they breached that duty when they failed to prevent Sharp's assault. There are four elements to a negligence claim: (1) the existence of a duty of care; (2) breach of that duty; (3) causation; and (4) damages. Sanchez v. Wal-Mart Stores, Inc., 221 P.3d 1276, 1280 (Nev. 2009). There is little dispute over whether Metro and corrections officers owed Barrese a duty of care and whether Barrese suffered damages as a result of Sharp's attack. So, Barrese's negligence claim depends upon whether Officer Gale's brief delay in discovering Sharp's assault and Metro's decision to house Sharp and Barrese in the same module represents a breach of their duty that caused Barrese's damages. Unfortunately for Barrese, they do not.

As for Barrese's claim against Officer Gale, there is no evidence that the officer's failure to prevent Sharp's attack breached a duty to protect Barrese. Barrese's claim against Officer Gale lives in the unspecified length of time between Sharp starting his assault and the officer becoming aware of that assault. The record is unclear how long that delay was. It is also unclear why there was the delay in the first place. From that uncertainty, Barrese assumes that Officer Gale neglected "his duty to observe the inmates in his module." P.'s Resp. at 20. However, the mere fact that corrections officers failed to prevent an inmate-on-inmate attack in their assigned modules does not automatically constitute a breach of their duty of care.

Additionally, the risk of injury from the defendant's breach must also be foreseeable. Estate of Smith v. Mahoney's Silver Nugget, Inc., 265 P.3d 688, 692 (Nev. 2011). Here, however, there is no evidence that Officer Gale could foresee that a brief failure to monitor Sharp's module would injury Barrese. Indeed, there is not evidence that Officer Gale knew of Sharp's violent history, and Sharp's conduct while in the dorm-style module made a violent attack less foreseeable. Sharp was arrested the month before Barrese. P.'s Resp. at 4. He had

1  been housed in the open module for about three weeks before Barrese arrived, and there is no
2  evidence that Sharp had any disciplinary infractions in that time. Id. Officer Gale had three
3  weeks of experience dealing with Sharp, and that history did not support an inference that Sharp
4  was likely to attack another inmate. Thus, Officer Gale had little reason to suspect that a brief
5  delay in monitoring Sharp would result in a violent attack on Barrese. Because there is no
6  evidence that the attack was foreseeable, the officer's lapse in monitoring Sharp was not the
7  cause of Barrese's injuries. As a result, summary judgment is appropriate on Barrese's
8  negligence claim.

### C.  Barrese is Not Entitled to Punitive Damages

Finally, the defendants move for summary judgment on Barrese's claim for punitive damages. Punitive damages are appropriate in § 1983 actions where the defendants' conduct is "motivated by evil motive or intent," or has "involve[d] reckless or callous indifference" to the plaintiff's civil rights. Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005). Because the Court has granted summary judgment on Barrese's Eighth Amendment claims, there is no claim to support punitive damages. Additionally, Barrese has failed to demonstrate deliberate indifference, much less an evil motive, or callous indifference to his civil rights. Accordingly, punitive damages are unwarranted.

### IV.    Conclusion

Accordingly, IT IS HEREBY ORDERED that the defendants' Motion for Summary Judgment (ECF No. 17) is **GRANTED in part** and **DENIED in part**. The motion is granted on every claim except Barrese's Fourth Amendment claims for over-detention and false imprisonment.

IT IS FURTHER ORDERED that Barrese has failed to show the callous indifference to his civil rights necessary to warrant punitive damages.

Dated this 10th day of August, 2020.

Kent J. Dawson
United States District Judge